IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| B.L. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | ________________________ |
| | : | |
| DAKSH & LAKSHITA LLC, | : | |
| | : | |
| Defendant. | : | |

# COMPLAINT

Matthew B. Stoddard
Patrick J. Hannon
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com
pat@legalhelpga.com

**Attorneys for Plaintiff**

**TABLE OF CONTENTS**

I. Introduction....................3

II. Procedural Issues and Parties....................7

III. Facts....................8

A. Plaintiff's Trafficking at the Knights Inn....................8

B. Information Regarding the Knights Inn and Plaintiff's Experience Not Being Unique....................22

C. Policies and Procedures that Facilitated Plaintiff's and Others' Sex Trafficking....................25

D. Industry Knowledge....................28

E. Defendant's Knowledge as to Plaintiff....................33

IV. Count 1: TVPRA Civil Beneficiary Claims....................38

V. Count 2: Premises Liability Law....................42

VI. Count 3: Nuisance Law....................44

VII. Causation And Damages....................45

VIII. Prayer For Relief....................47

# I. INTRODUCTION

1. This case involves the sex trafficking in July 2018 of B.L., who was then 17, at the Knights Inn Atlanta, an Atlanta-area hotel notorious for drugs, prostitution, sex trafficking, and violent crime.

2. The Knights Inn Atlanta ("Knights Inn" or "the hotel") was located at 4330 Fulton Industrial Boulevard, SW, Atlanta, Georgia 30336.

3. Defendant Daksh & Lakshita LLC owned, operated, and managed the Knights Inn at all times relevant to this Complaint.

4. Defendant was aware of the hotel's reputation and, instead of acting, chose to do nothing, thereby creating a safe space for those seeking to commit crimes without fear of detection or consequence. Defendant then profited from the increased room rentals this system created (i.e. creating a safe space for drug trafficking, human trafficking, commercial sex, and other crime).

5. Defendant was warned on numerous occasions prior to Plaintiff's trafficking by law enforcement, news articles, and the overwhelming and unignorable presence of crime that the Knights Inn was a haven for prostitution, sex trafficking, and other crimes.

6. Given the above, Defendant knew or should have known that changes had to be made at the Knights Inn. However, instead of contacting law enforcement,

hiring appropriate security, or taking other reasonable measures to deter commercial sex, Defendant chose to profit from the room revenues and to provide cover for traffickers seeking a place operate free of repercussions.

7. As a direct and foreseeable result of Defendant's actions and inactions, Plaintiff in this case was brought to Defendant's hotel to be trafficked, beaten, threatened, and sold for sex.

8. Defendant had every reason to know what was happening to Plaintiff, and Defendant facilitated her trafficking. When Plaintiff was brought to the Knights Inn, the following occurred:

a. One of Plaintiff's traffickers, Tiara Holmes, was an adult woman, who was a well-known prostitute in the area around the Knights Inn. She always dressed in revealing clothing, sometimes wearing only a bra as a top, and also wearing a conspicuous purple and pink wig.

b. Plaintiff's traffickers forced Plaintiff to wear extremely tight, short skirts and shorts.

c. Plaintiff had just turned 17, but she appeared even younger.

d. One of Plaintiff's traffickers went to the front desk at the Knights Inn seeking a room. Plaintiff stood silently next to her with a mark on her

face from a recent beating. Both were dressed in revealing clothing, appearing to be working as prostitutes.

e. Defendant rented a room to Plaintiff's trafficker, and permitted her to pay in cash.

f. Defendant's employees then watched as the 17-year-old B.L. came down from her room, walked right past the front desk, met an adult male just outside the hotel front doors, and walked him up to her room. A short time later they saw the man walking past the front desk again as he exited the hotel. That pattern happened over and over again.

g. Defendant's employees also watched as the 17-year-old B.L. came down from her room, walked right past the front desk and through the parking lot to Fulton Industrial Boulevard, which was infamous for commercial sex at the time and had been for decades. B.L. would then walk back to the Knights Inn with an adult man, and the two would walk together right past the front desk and go up to the hotel room. The man would exit past the front desk a short time later. That pattern happened over and over again as well.

h. During Plaintiff's stay at Defendant's hotel, her trafficker refused housekeeping services for the entire time. But Plaintiff and her

trafficker repeatedly requested extra towels and wash cloths from the hotel staff, and hotel staff gave them the extras.

i. On one occasion, Defendant's housekeeper observed that Plaintiff and her trafficker were engaged in commercial sex and offered Plaintiff condoms from her housekeeping cart.

j. During Plaintiff's stay at Defendant's hotel, Plaintiff's traffickers kept her under the influence of drugs and alcohol, so Plaintiff always appeared "zoned-out" and glassy-eyed.

k. Plaintiff's trafficker arranged for 15 to 20 men to come to Plaintiff's motel room for short periods of time (under an hour) to have sex with Plaintiff.

l. Despite the above, when Plaintiff's trafficker went to the front desk each day to rent the room for one more day, Defendant continued to rent the room to Plaintiff's trafficker.

m. The end result of the above was that Plaintiff's trafficker and Defendant entered into an understood agreement whereby Defendant provided a safe space for the sale sex, and Plaintiff's trafficker would continue to rent rooms from Defendant – thus creating profit for all involved.

## II. PROCEDURAL ISSUES AND PARTIES

9. Given the nature of the case, B.L. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed her full name to defense counsel or will do so immediately upon identification of defense counsel. When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously. Upon information and belief, Defendant will consent to Plaintiff proceeding without publicly disclosing her name.

10. Daksh & Lakshita LLC ("Daksh & Lakshita") is a Geogia corporation that filed a certificate of termination on October 13, 2020.

11. Regardless of any purported termination, Daksh & Lakshita is subject to suit under OCGA § 14-11-605.

12. Daksh & Lakshita can severed through its former registered agent and managing agent, Al Shaheed, 1174 D, Pryor Road, Atlanta, Georgia 30315.

13. Daksh & Lakshita can also be served through the Georgia Secretary of State under Fed. R. Civ. P. 9(e)(1) & (h)(1), and OCGA § 9-11-4(e)(1)(A).

14. Daksh & Lakshita was properly served with process in this matter.

15. Daksh & Lakshita is subject to the jurisdiction and venue of this Court.

16. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, which is a law of the United States.

17. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Fulton County Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## III. FACTS

### A. Plaintiff's Trafficking at the Knights Inn

18. During the entire period that B.L. was trafficked for sex at the Knights Inn, she was a minor.

19. Plaintiff was sex trafficked as a minor at the Knights Inn on several dates in July 2018, during which time she was an invitee.

20. On or about July 9, 2018, Plaintiff ran away from her grandmother's house in Pearson, Georgia.

21. Plaintiff had been communicating through messaging applications with Roderick Hayes ("Hayes"), a/k/a "Yongn Ambitious," an adult man who was

serving time in a Georgia prison. Hayes promised B.L. that his friends (and he after his release) would help B.L. and take care of her.

22. Hayes arranged to have B.L. picked up near her home and brought to a gas station on Fulton Industrial Boulevard near the Knights Inn.

23. An adult woman named Tiara Holmes ("Holmes"), a/k/a "Cookie," took B.L. from the gas station to the nearby A2C Budget Hotel, where Holmes already had rented a room.

24. The A2C Budget Hotel is directly across Shirly Drive from the Knights Inn. (Although the Knights Inn is just off of Fulton Industrial Boulevard, its back side borders Shriley Drive.)

25. In addition to being a trafficker, Holmes was also a prostitute who had worked this area of Fulton Industrial Boulevard for some time before B.L. arrived, and Holmes was known as a commercial sex worker to hotel owners and operators on this part of Fulton Industrial Boulevard.

26. Upon arrival at the A2C Budget Hotel, Holmes took B.L. her room where, unbeknownst to B.L., two men were waiting. One of the men raped B.L., which Holmes knew would happen and was what she had intended.

27. When Holmes came back into the room, she learned that B.L. had not secured payment from her assailants. Holmes became angry with B.L. and beat her leaving a visible red mark on B.L.'s cheek.

28. Holmes beat B.L. to control her, and Hayes had instructed Holmes to beat B.L. for that reason.

29. Holmes also gave B.L. drugs and alcohol to control her throughout the trafficking period.

30. Holmes trafficked B.L. for commercial sex out of the A2C Budget Hotel for approximately 2 days, and then she left the A2C Budget Hotel and took B.L. to the Knights Inn across the street.

**i. The Knights Inn and Surrounding Area**

31. The Knights Inn at that time was a multi-story, interior-entry hotel. The only way for hotel guests to access their rooms was through the front doors, which are shown under the porte cochere in the following photo. The front doors open to the main lobby where the front desk is located. The Knights Inn at all times during the trafficking period appeared materially as depicted in this photo:




32. This area of Fulton Industrial Boulevard was infamous for having the worst problem with commercial sex in the Atlanta metropolitan area. This section of Fulton Industrial Boulevard was widely known for its commercial sex problem both in the Atlanta media and among Atlanta area residents and business owners.

33. Owners and operators of hotels on this part of Fulton Industrial Boulevard were particularly aware that commercial sex was rampant. That fact was obvious to anyone who traveled to or from a business on Fulton Industrial Boulevard because, among other reasons, it was common to see prostitutes soliciting for commercial sex along the street. Also, it was common for prostitutes and traffickers to use hotels as a place to have commercial sex and to traffic juveniles for sex.

34. Additionally, police and county officials told all hotel owners and operators on this section of Fulton Industrial Boulevard about a task force aimed at cleaning up the boulevard, and Police asked the hotels to participate in the task force and in their efforts to combat commercial sex and sex trafficking.

35. Also, in 2013, Fulton County passed an ordinance aimed at shutting down hotels along Fulton Industrial Boulevard that had too many problems with crime, including with commercial sex and sex trafficking. An owner of a hotel very near the Knights Inn successfully challenged that ordinance in court, but not before it was publicized and understandably got the attention of all area hotel owners and operators.

**ii. Plaintiff's and Holmes' Appearance**

36. Throughout the trafficking, Holmes made B.L. wear tight fitting, very short skirts and shorts (such that they just covered B.L.'s buttocks), and Holmes required that B.L. wear full face make up all the times that she was at the Knights Inn. Even though B.L. was had recently turned 17 when she arrived at the Knights Inn, she appeared to be considerably younger. So, during the trafficking period, B.L. appeared to anyone who saw her as young girl dressed and made up as a prostitute in an area infamous for commercial sex.

37. Throughout the trafficking, Holmes likewise always wore tight fitting, very short skirts and shorts, except on occasion she also wore shorts with only a bra as a top. In addition, Holmes was very conspicuous, wearing a purple and pink wig at times.

38. Because Holmes gave B.L. drugs and alcohol to control her, B.L. appeared to be under the influence of alcohol and drugs. She was glassy-eyed, tired looking, and had a "zoned out" appearance throughout the trafficking period.

**iii. Plaintiff's Conspicuous Trafficking**

39. That is how Holmes and B.L. appeared when they left the A2C Budget Hotel, and walked across the above-depicted parking lot and through the Knights Inn's front doors.

40. They went to the front desk, which is located in the lobby behind the front doors depicted above. Holmes, with B.L. standing silently by her side, requested and obtained a hotel room at the Knights Inn for the two of them. BL said nothing during check in and avoided eye contact with hotel employees. She still had the large red mark on her cheek from Holmes' earlier beating, and had the glassy-eyed and "zoned out" appearance of being under the influence of drugs and alcohol.

41. Holmes requested and was permitted to pay for the room in cash.

42. Defendant rented Room 217 to Holmes, and Homes began trafficking B.L. out of that room.

43. Holmes on multiple occasions forced B.L. to have sex with men for money while at the Knights Inn.

44. Holmes was trafficking Plaintiff in cooperation with, and often directed by, Hayes from prison. Although in prison, Hayes was still able to communicate with people outside of prison through cell phone calls, texts, and messaging applications.

45. During the period that B.L. was at the Knights Inn, Hayes and Holmes required B.L. to have commercial sex with whomever they chose.

46. While at the Knights Inn, Holmes contacted her and Hayes' regular clients and arranged for them to come to the Knights Inn to have sex with B.L. for money. Hayes also posted photos of B.L. undressed or partially undressed on the internet to solicit men for commercial sex.

47. B.L. would meet the "johns" who came to the Knights Inn to have sex with her right outside of the hotel front doors. To do that, B.L. would leave the hotel room, walk through the lobby and out the front doors. She would then meet the "johns" right outside the front doors where they had been loitering, waiting to be brought up to the room. The front desk person saw these meetings because the front

doors were glass, and the front desk faced the front doors and had an unobstructed view of the doors.

48. After meeting the "johns," B.L. would then walk with them through the lobby, right back past the front desk worker again, and up to Room 217. The "johns" would then leave the hotel a short time later through the front doors.

49. On several occasions, Holmes forced B.L. to walk the area around the Knights Inn along Fulton Industrial Boulevard to find men to pay Holmes to have sex with B.L. To do this, B.L. would have to leave the hotel room, walk through the lobby (and right by the front desk worker), out the front doors, and through the hotel parking lot to Fulton Industrial Boulevard. When B.L. came back with a "john," she would reverse those steps and again walk back past the front desk, this time with an adult "john" beside her.

50. Holmes also would walk downstairs and through the lobby (right by the front desk worker) to meet "johns" at the front door of the hotel to bring them up to her hotel room.

51. Each time Holmes and B.L. walked through the lobby, they were wearing tight fitting, very short skirts or shorts, as described above, and each time the front desk workers saw Holmes and B.L. because they walked right by the front desk. Each time they walked back to the hotel room with a "john," she was in full

view of the managers and employees of the Knights Inn, who could see that she was underage and obviously taking a "john" back up to her room.

52. When B.L. walked through the lobby and then through the area around the Knights Inn, she was in full view of the managers and employees of the Knights Inn, who could see that she was underage and obviously was walking the street in search of commercial sex clients.

53. Further, upon information and belief, the Knights Inn had a video surveillance system that was monitored such that the managers and employees of the Knights Inn watched B.L. walking to meet the "johns" at the front of the hotel and watched her walking back from Fulton Industrial Boulevard through the Knights Inn parking lot and the hotel lobby with the "Johns."

54. The Knights Inn also had security personnel working at the hotel who scrutinized people arriving at the hotel. Security personnel would have seen the above-described movements of B.L., Holmes, and the "johns" through the hotel. Nevertheless, security personnel did not take any action because they knew that the hotel depended on revenue from commercial sex workers and sex trafficking victims.

55. Holmes took all of the money that the "johns" paid for having sex with B.L.

56. Holmes would then use that money to pay in cash for one night at a time at the Knights Inn, booking the next night's stay before check-out time each morning.

57. B.L. accompanied Holmes to the front desk when Homles went to pay for the day's room with the money earned from the sex trafficking of B.L. On each occasion, B.L. stood silently next to Holmes. B.L. wore the same short, tight-fitting clothing described above and appeared to be under the influence of drugs and alcohol.

58. Defendant collected revenue from rental of the rooms at the Knights Inn in which B.L. was forced to have sex.

59. Near the beginning of their stay at the Knights Inn, Holmes and B.L. were passing housekeeping when Holmes told housekeeping not to come into their room. Housekeeping agreed not to do so. Holmes also put out the do-not-disturb sign.

60. Without permitting housekeeping into her room, Holmes would give housekeeping the soiled linens and towels, and housekeeping would give Holmes clean sheets and towels. Holmes also asked housekeeping for extra towels and wash clothes, and housekeeping gave her extra towels and wash clothes.

61. On one occasion when Holmes and B.L. were passing housekeeping, B.L. saw a box of condoms on the housekeeper's cart, and the housekeeper, observing that the two were engaged in prostitution, asked B.L. if she needed any condoms.

62. On another occasion, B.L. went to the front desk asking for additional towels and wash cloths. The front desk worker gave B.L. the additional towels and told B.L. to put the soiled ones outside the room.

63. Holmes took sexually explicit photographs of B.L., and then used those photographs to bring more buyers to Defendant's Knights Inn.

64. The frequency of the trafficking was such that B.L. was raped at the Knights Inn by approximately 15 to 20 men.

65. In short, the following happened repeatedly: a buyer came to the Knights Inn and purchased the "right" to have sex with B.L. from Holmes, then the buyer raped B.L. in Defendant's Knights Inn hotel rooms.

66. B.L. was sexually assaulted approximately 15 to 20 times while at the Knights Inn by various "johns."

67. For the duration of the stay at the Knights Inn, Holmes used a portion of the proceeds from the commercial sex acts to book lodging at the Knights Inn for the next night.

68. Holmes and Hayes used Defendant's WIFI network to communicate with each other and with B.L., and to arrange for "dates" for B.L., and to generally run the trafficking operation. Upon information and belief, Holmes paid for use of Defendant's WIFI network either through the room rental fees or a separate charge.

69. After approximately three days at the Knights Inn, Holmes took B.L. back to the A2C Budget Hotel.

70. On July 17, 2018, Fulton County Police took B.L. into custody.

71. While at Defendant's Knights Inn, more than 15 adult men visited Plaintiff's room to purchase sex with a child. The adult men arrived in view of the Knights Inn's lobby, security personnel, and surveillance cameras. Defendant knew or should have known that the large number of adult male visitors who stayed in Plaintiff's room for an average of only 15-30 minutes was indicative of commercial sex activity, including minor sex trafficking. Defendant negligently failed to respond to the evidence it knew or should have known indicated minor sex trafficking, including its failure to control and monitor the frequency of male visitors to Plaintiff's room.

72. Defendant had ample opportunity to observe the age and appearance of Plaintiff as she frequently appeared around the Knights Inn property, including common areas and approaches, wearing little clothing and soliciting adult men.

73. On information and belief, Holmes had previously rented rooms and brought her commercial sex clients to Defendant's Knights Inn. As such, at least one of Plaintiff's traffickers were familiar to Defendant's employees, agents, and/or representatives at the time she trafficked Plaintiff for sex at the Knights Inn.

74. Plaintiff was forced (through coercion, violence, and threats of violence) to have sex with men in exchange for money in rooms at the Knights Inn that her traffickers rented from Defendant.

75. Plaintiff's traffickers took the money from the sex acts and used it to re-rent Knights Inn rooms from Defendant, and then those traffickers again forced (through coercion, violence, and threats of violence) Plaintiff to have sex with men in exchange for money in the Knights Inn rooms.

76. Defendant's staff and agents observed the following numerous well-known and visible signs of a minor sex trafficking victim that B.L. exhibited:

a. her young age and inappropriate appearance, poor hygiene, fatigue, sleep deprivation, and red mark and other physical injuries;

b. lack of freedom of movement and constant monitoring by an older person, known to be a prostitute;

c. no control over or possession of money;

d. constant and excessive requests for towels and sheets to housekeeping;

e. prohibition of hotel employees to enter the Knights Inn room;

g. rooms rented daily by the same trafficker who paid with cash; and

i. loitering, soliciting, and heavy foot traffic to and from her Knights Inn room with a constant stream of male visitors entering the room one at a time, staying a short period, and then leaving.

**iv. Plaintiff's Traffickers Convicted**

77. Holmes was convicted of sex trafficking of B.L., including, among other crimes, sexual exploitation of a child, keeping a place of prostitution for a person under 18, and trafficking for sexual servitude.

78. Holmes was sentenced to prison for those crimes committed against B.L.

79. Hayes was convicted of sex trafficking B.L. including, among other crimes, sexual exploitation of a child, pimping, and trafficking for sexual servitude.

80. Holmes was sentenced to prison for those crimes committed against B.L.

## B. Information Regarding the Knights Inn and Plaintiff's Experience Not Being Unique

81. Defendant had actual or constructive knowledge of publicly available online Google reviews and online reviews through other platforms reporting widespread prostitution, sex trafficking, and other illicit activities occurring at the Knights Inn.

82. A 2017 Google review states:

> [U]pon check [in], a Prostitute was leaving the hotel and the Guy at the front desk talked to her like they were friends….

83. Another 2017 Google review states:

> Awful service. As soon as we get there a prostitute walks by our car. My girlfriend went to park and a gang surrounded her car! Awful atmosphere. All the halls reak of dope and weed….

84. Yet another 2017 Google review reads:

> The worst!! They deserve -⭐ for filthy room and crackheads & prostitutes….

85. A 2017 Google review states:

> Bed Bugs, Hookers, DrugDealers, And the management recieving proceeds from the illeagal activities….Do not waist your money at this place. One big crime ring going on.

86. A 2017 Google review states:

> This is a hooker hotel….crackheads EVERYWHERE. I have stayed in trashy hotels before but this is just crazy.

87. A 2017 Google review states:

> [T]hreatening people are loitering in the lobby….this is a hotel for hookers and drug dealers.

88. A 2018 Google review states:

> They rent rooms for minutes to let the pimps pimp the prostitutes so they could get a cut.

89. A 2018 Google review states:

> I was in the elevator on my way to the room and they guy that work security there was talking about selling drugs to one of the people staying there. There is nothing but drug dealers and prostitutes running around that hotel….

90. A 2018 Google review states:

> No lights, roaches, bed bugs, smell of weed, asked to buy drugs upon arrival, prostitutes every where,and no a/c. It's a place to sleep if you're that desperate.

91. A 2018 Google review states:

> Building run down prostitutes everywhere drug dealing don't get caught Slippin lol.

92. A 2018 Google review states:

> It's in a pretty bad area. Dope boys and prostitutes everywhere you turn.

93. A 2018 Google review states:

> Then the area is bad as well, they have hookers & drug dealers standing all round & running in & out of the lobby.

94. A 2018 Google review states:

Scariest place I have ever been. Hookers and drug dealers everywhere.

95. Defendant purchased the Knights Inn on August 25, 2017, for $2.1 million. Although some of the above 2017 reviews may have been before Defendant bought the hotel, Defendant performed a due diligence search for information about the hotel before paying $2.1 million dollars for it. Upon information and belief, Defendant's due diligence process included reviewing public information about the hotel such as its on-line reviews.

96. The online reviews provided Defendant with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Knights Inn.

97. Police incident reports from the Knights Inn are not available without a subpoena, but the crime grid for the Knights Inn shows the following arrests from January 1, 2015 through June 1, 2018:

a. 6 aggravated assaults or aggravated batteries
b. 6 robberies, 3 of which were armed robberies
c. 4 rapes
d. 1 sexual exploitation of a child
e. 18 batteries
f. 36 fugitives located

g. Countless charges of criminal trespass, theft, and other crimes.

98. The police reports, upon information and belief, contain reports of prostitution, sex trafficking, and drug dealing that put Defendant on notice of substantially similar prior and subsequent bad acts at the property.

**C. Policies and Procedures that Facilitated Plaintiff's and Others' Sex Trafficking**

99. For the purpose of facilitating and catering to the criminal element at the Knights Inn – which includes but is not limited to Plaintiff's traffickers at all relevant times – Defendant engaged in the following behaviors and policies:

a. Defendant continued to rent rooms to those they knew or should have known were engaged in sex trafficking, drug sales, and prostitution.

b. Defendant maintained policies and systems whereby they would not call the police on those they knew or should have known were engaged in sex trafficking and prostitution, thereby providing an environment where one could engage in sex trafficking without fear of detection or repercussions.

c. Defendant maintained policies and systems whereby housekeeping services could be suspended, thereby allowing traffickers and other criminals to avoid detection.

d. Defendant maintained policies and systems whereby towels and sheets could be obtained by traffickers many days in a row without question to allow for “johns,” pimps, and traffickers’ comfort when engaging in commercial sex.

e. Defendant maintained policies and systems whereby the Knights Inn staff would not report clear signs of sex trafficking such as trashcans full of used condoms and empty bottles of lube, pimps surveilling rooms, and high traffic of non-guests coming and going from the Motel.

f. Defendant maintained policies and systems whereby Defendant did not check all guests’ I.D.s at the motel, thereby allowing women, young girls, and “johns” (by the dozens over weekends) to come and go freely from the motel, which further facilitated pimps and traffickers to conduct their business and avoid detection.

g. Defendant maintained policies and systems whereby they would allow guests to pay for rooms day-by-day and in cash to cater to the needs of traffickers, who would only deal in cash.

h. Defendant maintained policies and systems whereby staff would not call or report signs of sex trafficking, prostitution, or drug sales for the

purpose providing a space wherein those engaged in these activities would come back and rent room in order to engage in said vices.

100. Despite warnings from law enforcement, news reports, customer complaints, and the presence of overwhelming and apparent crime on the property Defendant refused to change its above policies and systems.

101. Defendant maintained its policies and systems following those warnings described above for the purpose of creating an environment of low disruption and detection for criminality and to continue to attract and rent rooms to those looking to engaging in illegal activity (like sex trafficking and prostitution) – and thus profiting from said rooms rentals.

102. By Defendant maintaining the above policies and systems and providing Plaintiff's trafficker motel rooms over and over again – despite those warnings and red flags described above, both general and specific to Plaintiff – Defendant facilitated Plaintiff's (and others) trafficking by providing a venue that catered to Plaintiff's trafficking, which Defendant knew or should have known about.

103. By Defendant maintaining the above policies and systems and providing Plaintiff's trafficker a room (or rooms) over and over again – despite those warnings and red flags described above, both general and specific to Plaintiff – and

providing a venue that catered to Plaintiff's trafficking, Defendant entered into a tacit agreement with Plaintiff's traffickers whereby Defendant provided a venue that facilitated Plaintiff's trafficking and, in exchange, Defendant profited from Plaintiff's trafficking/trafficker through repeated and increased room rentals.

**D. Industry Knowledge**

104. Defendant knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000, and the passage of O.C.G.A. § 16-5-46 in 2007.

105. Defendant knew or should have known that, in 2013, the acting Attorney General Sam Olens announced a statewide campaign, "Georgia's Not Buying It," to combat child sex trafficking. As part of the campaign, AG Olens' office "collaborated with partners to conduct trainings and increase awareness," which included "multiple trainings for the hotel industry."[1]

106. Defendant knew or should have known that the Georgia legislature passed O.C.G.A. § 16-5-47 in 2013, which required hotels to post sex trafficking

---

[1] *See* https://law.georgia.gov/press-releases/2013-03-18/attorney-general-olens-law enforcement-announce-campaign-fight-sex (last visited Feb. 11, 2022).

notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted."

107. Defendant knew or should have known that the Federal Bureau of Investigations ranked Atlanta one of the worst cities in the country for child sex trafficking.[2]

108. Defendant knew or should have known that as early as 2001, City of Atlanta officials publicly warned of sex trafficking at area hotels and of the relationship between prostitution and sex trafficking. At that time, the Atlanta Journal-Constitution published a groundbreaking series called *Selling Atlanta's Children*, explaining the problem of sex trafficking in the City and that hotels are complicit in sex trafficking trade.[3]

---

[2] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, Exploiting Americans on American Soil: Domestic Trafficking Exposed, The Federal Bureau of Investigation, (June 7, 2005), available at https://archives.fbi.gov/archives/news/testimony/exploiting-americans-onamerican-soil-domestic -trafficking-exposed (last visited Feb. 11, 2022).

[3] Jane O. Hansen, Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, The Pimps: Prostitution's Middle Man Slides by in Court, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, Feds, Police Elsewhere Finding Solutions, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman

109. Defendant knew or should have known that the Atlanta metro-area well-publicized reputation as an "epicenter for human trafficking, and particularly child sex trafficking," and as "the number one city for child sex trafficking."[4]

110. Defendant knew or should have known that in 2007, the Atlanta metro-area's sex trafficking economy was worth almost $300 million annually with traffickers reporting average *weekly* earnings of roughly $33,000.[5]

111. Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child Protection Code of Conduct (the "Code") which outlines well-established best practices for the hospitality industry to combat sex trafficking, and identifies six simple steps hotels can take to prevent child sex trafficking, such as:

a. establishing corporate policies and procedures against sexual exploitation of children;

---

said."); Jane O. Hansen, When Danger is as Close as a Phone, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, Police Plan Child Prostitution Unit, The Atlanta Journal-Constitution, April 28, 2001.

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month*, Jan. 29, 2015, *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Feb. 09, 2022).

[5] Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) available at https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM.

b. training employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. providing information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

f. reporting annually on the company's implementation of Code-related activities.[6]

112. Defendant knew or should have known that, compared to other types of businesses,[7] hotels play a critical role in sex trafficking ventures and serve "a

[6] *See* ECPAT-USA, *The Tourism Child-Protection Code of Conduct*, *available at* www.ecpatusa.org/code/ (last visited Feb. 11, 2022).

[7] *Cf. Sun Tr. Banks, Inc. v. Killebrew*, 266 Ga. 109, 111 (1995) (Sears, J., concurring) ("[T]he banking industry itself anticipates that criminal activity will frequently occur at ATMs."); *Killebrew v. Sun Trust Banks*, 221 Ga. App. 679, 680-81 (1996) (physical precedent only) ("it would be difficult to say that a criminal occurrence at an ATM is unforeseeable as a matter of law. Indeed, such a conclusion could be reached only by turning 'foreseeability' into a legal term of art totally divorced from its meaning in everyday usage.")

particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

113. Defendant knew or should have known that "[t]he hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity… From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property… With proper training, a front desk agent or a housekeeper can notice that something is not right and respond."[8]

114. Defendant knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

115. At all relevant times, Defendant knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii)

---

[8] *See* https://www.ecpatusa.org/hotel-training (last visited Feb. 7, 2022) (emphasis added).

extensive federal / state / local government testimony and press quotations informing the public that Atlanta area motels were a particular hotbed of sex trafficking, (iii) a long running expose in the premier Atlanta newspaper (the AJC) that exposed the extent of the sex trafficking problem at Atlanta area motels, and (iv) the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

**E. Defendant's Knowledge as to Plaintiff**

116. Defendant directed, operated, supervised, monitored, managed, and/or employed all managers, housekeepers, and other staff at the Knights Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized B.L., and other crimes at the Knights Inn during the relevant period.

117. Over the course of the trafficking, the Knights Inn staff had ample opportunity to observe the numerous well-known and visible signs of a minor sex trafficking victim that B.L. exhibited, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, no control of or possession of money, loitering, soliciting male patrons, and heavy foot traffic to her hotel room.

118. This heavy foot traffic to B.L.'s Knights Inn room was voluminous and indicative of sex trafficking, especially considering that the men always walked with B.L. or Holmes alongside of them and that B.L. was obviously a minor. A daily parade of men arrived at the Knights Inn, either by car or by walking through the parking lot with B.L., walked right past the front desk to rooms they did not rent, and stayed in the rooms for only 15 to 30 minutes before walking back out through the lobby. Also, B.L. could be found walking around the Knights Inn premises, common areas, and approaches – wearing little clothing and soliciting adult men for sex.

119. B.L.'s victimization followed a pattern that was readily observable and should have been obvious to Knights Inn employees based on information available to the public at large and to the hotel industry.

120. In 2016, the Department of Homeland Security ("DHS") issued guidelines on prevention of sex trafficking which identify numerous warning signs indicative of human trafficking at hotels that hotel staff should be vigilant in observing on the hotel premises, such as:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
b. persons who lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n. waiting at a table or bar and picked up by a male (trafficker or customer);

o. persons asking staff or patrons for food or money; and

p. persons taking cash or receipts left on tables.[9]

121. Prior to B.L.'s trafficking, the End Child Prostitution and Trafficking (ECPAT-USA) published a list of position specific indicators of human trafficking that hotel staff should recognize to combat trafficking, such as: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings.[10]

122. During the time B.L. was trafficked at the Knights Inn, both B.L. and the rooms where B.L. was trafficked exhibited numerous well-known signs of trafficking identified in the DHS guidance and by ECPAT-USA that gave Defendant and its employees constructive or actual knowledge of B.L.'s sex trafficking, including:

---

[9] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).

[10] *See* ECPAT-USA, *Human Trafficking Indicators*, available at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

a. B.L. wearing scantily clad clothing when she walked around the premises, common areas, and while escorting various men into the room.

b. B.L. being escorted and monitored by Holmes in the Knights Inn, around the premises and common areas.

c. Holmes always paying in cash for the room at the Knights Inn.

d. Holmes paying one night at a time and booking the next night's stay before check-out time.

e. Numerous men would park, stay in the room for approximately 15 to 30 minutes, and then leave.

f. Holmes constantly turning away housekeeping from the rooms where B.L. was being trafficked.

g. Knights Inn staff observing that Holmes and B.L. were engaged in commercial sex and offering B.L., a minor, condoms for that commercial sex.

123. Rather than taking reasonable steps to prevent sex trafficking, Defendant – in the quest for profits – created and maintained a business model that

attracted, facilitated and encouraged the commercial sex market by providing a private and anonymous venue for traffickers and buyers alike.

124. Defendant was aware of the short-term rentals of it rooms at the Knights Inn by buyers of commercial sex and the explicit and apparent purpose for which those rooms were rented.

125. B.L.'s sex trafficking at the Knights Inn was a foreseeable and preventable result of Defendant failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its Knights Inn and failing to prevent B.L.'s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

## IV. COUNT 1 – TVPRA CLAIMS

126. Defendant "knowingly benefited" from Plaintiff's trafficking because:

a. the traffickers rented rooms at the Knights Inn;

b. the traffickers used the Knights Inn WIFI network;

c. Defendant collected revenue from the room rentals and the use of the WIFI network; and

d. the victim was advertised for sex through the WIFI network and forced to have sex in the rooms.

127. Defendant took part in a common undertaking involving risk or profit with the traffickers because:

a. Plaintiff's trafficker would pay in cash for one night at a time, booking the next night's stay before check-out time;

b. Defendant directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

d. Defendant directly rented rooms to the same trafficker – Plaintiff's traffickers;

e. Defendant had commercial dealings with Plaintiff's trafficker and then continued to rent rooms to Plaintiff's trafficker.

f. Defendant had a continuous business relationship with at least one of Plaintiff's traffickers such that Defendant established a pattern of conduct with that trafficker.

g. Before Plaintiff arrived at the Knights Inn for the first night, Plaintiff's trafficker already had rented a room and had prior commercial dealings with Defendant and then reinstated those dealings.

h. Defendant associated with Plaintiff's traffickers in an effort to force Plaintiff to serve Defendant's business objectives.

i. Defendant owned, operated, and maintained the Knights Inn in question.

128. Plaintiff's traffickers' undertaking with Defendant violated the TVPRA with respect to Plaintiff because:

a. the traffickers recruited Plaintiff to participate in commercial sex acts at Defendant's Knights Inn by, among other reasons, stating that they would take care of the Plaintiff and then making Plaintiff work as prostitute;

b. the traffickers harbored Plaintiff at Defendant's Knights Inn for the purpose of Plaintiff participating in commercial sex acts at the property;

c. the traffickers transported Plaintiff to Defendant's Knights Inn for the purpose of Plaintiff participating in commercial sex acts at the Knights Inn;

d. the commercial sex acts occurred at Defendant's Knights Inn in a room rented by Plaintiff's trafficker;

e. the traffickers used force, threats of force, fraud, and coercion to cause Plaintiff to participate in commercial sex acts at Defendant's Knights Inn;

f. the traffickers threatened Plaintiff with violence and used this tactic to cause Plaintiff to engage in commercial sex acts at Defendant's Knights Inn;

g. the traffickers de-frauded Plaintiff by falsely telling Plaintiff that they would take care of Plaintiff, and then forcing Plaintiff to work as prostitute for them at Defendant's Knights Inn;

h. the traffickers coerced Plaintiff to participate in commercial sex acts at Defendant's property by threatening Plaintiff with physical harm if Plaintiff did not engage in commercial sex acts at Defendant's Knights Inn;

i. the traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited Plaintiff to engage in commercial sex acts in the Knights Inn rooms that the traffickers rented from Defendant;

j. Buyers came to Defendant's Knights Inn, purchased the "right" to have sex with Plaintiff from her traffickers, and then the buyers raped the Plaintiff at Defendant's Knights Inn;

l. Holmes was aware that B.L. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendant's Knights Inn;

m. the traffickers utilized Defendant's wireless internet connection to communicate with each other and to arrange for the commercial sex acts; and

n. Other actions to be proven at trial.

129. The venture in which Defendant participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport Plaintiff to the Knights Inn by their traffickers (and their associates), and other reasons to be proven at trial.

130. As shown above, Defendant had – at minimum – constructive knowledge that Plaintiff was being trafficked for sex at the property. *See also* Fed. R. Civ. P. 9(b) ("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, *LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

131. Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its Knights Inn at all relevant times, giving Defendant specific and direct knowledge of sex

trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at the Knights Inn during the relevant period.

## V. COUNT 2 – PREMISES LIABILITY LAW

132. Defendant owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the Knights Inn safe. *See* O.C.G.A. § 51-3-1.

133. Defendant's actual and constructive knowledge of criminal activity at the Knights Inn made the repeated raping of Plaintiff foreseeable to the Defendant.

134. Defendant knew or should have known of steps to take to prevent the Knights Inn from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to deter the crimes or warn the Plaintiff.

135. Defendant was negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

a. Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b. Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the Knights Inn;

c. Negligently failing to properly inspect and maintain the premises;

d. Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the Knights Inn;

e. Negligently failing to properly retain, hire, train, and supervise said employees;

f. Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

g. Negligently failing to respond to online reviews and publicly available information;

h. Negligently failing to prevent loitering, pandering, prostitution and trespassing;

i. Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j. Negligently failing to inspect, patrol, or appropriately monitor the property;

k. Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

l. Negligently failing to remediate a long history of crime at the Knights Inn;

m. Negligently failing to warn invitees of known hazards at the property;

n. Negligently representing to invitees that the property was safe; and

o. Other negligent acts that violated Georgia common law to be proved at trial.

## VI. COUNT 3 – NUISANCE LAW

136. Defendant also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the hotel.

137. Defendant was aware of the dangerous criminal condition at the hotel and negligently allowed that condition to continue.

138. Defendant maintained a dangerous criminal condition at the hotel.

139. Defendant's creation of and failure to abate a nuisance caused injury to Plaintiff.

## VII. CAUSATION AND DAMAGES

140. As a direct and proximate result of Defendant's acts and omissions Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

141. Defendant is joint and severally liable with Plaintiff's traffickers, and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

142. Defendant is liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

143. Plaintiff brings each and every claim for damages permissible under the law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a. Personal injuries;

b. Past, present and future pain and suffering;

c. Disability;

d. Disfigurement;

e. Mental anguish;

f. Loss of the capacity for the enjoyment of life;

g. Loss of earning capacity;

h. Lost wages;

i. Diminished capacity to labor;

j. Incidental expenses;

k. Past, present and future medical expenses;

l. Permanent injuries;

m. Attorney's fees;

n. Punitive damages; and

o. Consequential damages to be proven at trial.

144. Punitive damages should be imposed upon the Defendant without limitation or cap for its actions which are explained more fully above.

145. Defendant is also liable for paying Plaintiff's attorneys fees and litigation expenses pursuant to the TVPRA and O.C.G.A. § 13-6-11 because Defendant have acted in bad faith in the underlying transaction as shown herein.

146. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendant and for the following:

1) That process and summons issue requiring Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6) Punitive damages be imposed upon Defendant;

7) Plaintiff be provided with a trial by jury; and

8) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 31st day of October 2025.

**THE STODDARD FIRM**

*/s/ Patrick J. Hannon*
Matthew B. Stoddard
Georgia Bar No. 558215
Patrick J. Hannon
Ga. Bar No.: 074321
THE STODDARD FIRM
1534 N Decatur Road
P: 470-467-2200
F: 470-467-1300
matt@LegalHelpGa.com

pat@legalhelpga.com
***Attorneys for Plaintiff***